| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | **FILED**<br>JAMES J. WALDRON, CLERK<br>October 21, 2016<br>U.S. BANKRUPTCY COURT<br>NEWARK, N.J.<br>BY: /s/Margaret Cohen<br>Margaret Cohen, Deputy |
| In re:<br><br>REYVIS D. RIVAS,<br><br>                                         Debtor. | |
| BMW FINANCIAL SERVICES, N.A., LLC,<br><br>                                         Plaintiff,<br>v.<br><br>REYVIS D. RIVAS,<br>                                         Defendant. | Case No.       14-14111 (VFP)<br><br>Chapter 7<br><br>Adv. Pro. No.  14-1469 (VFP) |

## OPINION

**APPEARANCES:**

| | |
|---|---|
| MESTER & SCHWARTZ, PC<br>Jason Brett Schwartz, Esq.<br>1333 Race Street<br>Philadelphia, PA  19017<br>Attorneys for Plaintiff | FITZGERALD & ASSOCIATES<br>Nicholas Fitzgerald, Esq.<br>649 Newark Avenue<br>Jersey City, NJ  07306<br>Attorneys for Defendant |

**VINCENT F. PAPALIA, United States Bankruptcy Judge**

### I.     INTRODUCTION

   This matter is before the Court on the trial of BMW Financial Services' (the "Plaintiff" or "BMW") Complaint objecting to the discharge of Reyvis D. Rivas (the "Debtor") under §§ 727(a)(2), (a)(3) and (a)(5) of the Bankruptcy Code based primarily on the "disappearance" of a 2011 BMW X6 vehicle purchased by Debtor (the "Vehicle").  Debtor claims it was stolen; BMW claims its theft was orchestrated by the Debtor.  Trial was conducted on April 9, 2015, after which the Court directed the parties to make post-trial submissions.  Subsequent to trial and the post-trial submissions, the Debtor

advised the Court that the Vehicle had been located in California (Dkt. Nos. 34 and 35). As a result, the parties requested and were granted time to make additional submissions regarding this newly discovered evidence. The record was closed in this matter on July 18, 2016. The Court considered the testimony, the evidence at trial and the parties' pre- and post-trial submissions (to the extent referred to in this Opinion), and now renders its decision.

## II.    JURISDICTION

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended September 18, 2012, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. §§ 157(b)(2)(A) and (J). Venue is proper in this Court pursuant to 28 U.S.C. § 1408. The following constitutes the Court's findings of fact and conclusions of law as required by FED. R. BANKR. P. 7052.[1]

## III.    PROCEDURAL HISTORY

On March 6, 2014, the Debtor filed a Chapter 7 bankruptcy petition (Main Dkt. No. 1). On May 13, 2014, the Plaintiff timely filed an Adversary Complaint objecting to the Debtor's discharge under §§ 727 (a)(2), (a)(3) and (a)(5) of the Bankruptcy Code (Main Dkt. No. 10).

At two prior hearings on the case, the first on July 15, 2014, at which the Court denied Debtor's motion for summary judgment or to dismiss the complaint, and the second on December 16, 2014, at which the Court denied Plaintiff's motion to amend the complaint, Judge Kaplan (who was previously assigned to this case) limited the factual bases of Plaintiff's claims to the Debtor's loss or theft of the Vehicle as conduct that may require the Court to deny Debtor's discharge under 11 U.S.C. §§ 727(a)(2)(A), (a)(3) or (a)(5). The Court made clear that it would not allow Debtor's failure to

---

[1] To the extent that any of the findings of fact constitute conclusions of law, they are adopted as such. Conversely, to the extent that any conclusions of law constitute findings of fact, they are adopted as such.

provide insurance as a basis to deny discharge under 11 U.S.C. § 727(a)(3) (failure to maintain adequate records). At the July 15, 2014 hearing, the Court observed:

> I'm looking at the complaint. The only possibility I would see as a basis for a 727 objection to discharge would be if there was some collusion between Mr. Rivas and whoever stole the vehicle, and . . . the vehicle was liquidated, sold as part of some machinations.

(Dkt. No. 23, 7/15/14 Hr'g Tr. 2:16-21). Later in that hearing, the Court rejected Plaintiff's proposal to base the § 727(a)(3) claim on any failure by Debtor to provide proof of insurance of the Vehicle:

> Ms. Espanol: Under 727, Your Honor, (a)(3) the debtor adequately failed to provide records of vehicle insurance and he's required to do so under the contract, Your Honor.
>
> The Court: No, you're not going to win on that, all right?
> . . .
>
> The Court: That's [727(a)(3)] – financial records to disclose is the financial picture, not a specific type of record or document that benefits primarily your client. . . . You're not going to win on most of the grounds under 727, especially with the insurance. . . . [Discovery] should be tailored to what you can establish to prove a viable claim under 727, specifically, 727(a)(3) [sic], the debtors concealed, destroyed, mutilated, falsified any assets or possibly 727(a)(2) with the intent to hinder, delay or defraud, and he's destroyed or removed certain assets.

(Dkt. No. 23, 7/15/14 Hr'g Tr. 4:1-20).

On December 16, 2014, the Court denied the Plaintiff's motion to amend the complaint to include a count under 11 U.S.C. § 523 to except the debt from discharge or make Debtor's conduct in entering the retail installment contract a basis for denying discharge under § 727(a).[2] The Court opened the hearing with the question:

> [W]hat have you discovered in – uncovered in discovery that goes to the theft of the vehicle or a basis that you wouldn't have had before?

(Dkt. No. 24, 12/16/14 Hr'g Tr. 4:7-9). The Court concluded by reiterating that the factual and legal issues for Plaintiff's claim were limited to the loss of the Vehicle:

---

[2] Plaintiff also reargued motor vehicle insurance as a basis for denying discharge under 11 U.S.C. § 727(a) at the December 16, 2014 hearing (Dkt. No. 24, 12/16/14 Hr'g Tr. 4:10-24 and 5:23-6:6) but was not successful.

> [Y]our complaint is under 727(a). . . . And it's 727(a)(2) to hinder, delay or defraud, you transferred or concealed an asset, 727(a)(5), the debtor has failed to explain the loss of an asset, and 727(a)(3) deals with books and records.
>
> That's different than challenging the underlying transaction as far as going into the transaction in the first place. That's an after the fact. That's where's the vehicle. That's where you fail to explain where the vehicle is gone or you're still concealing the vehicle or you engage—you fail to produce records showing where the vehicle is. . . . [I]t's unrelated to going into you shouldn't have entered into the transaction in the first place or you committed a false representation in entering into the transaction in the first place or even providing a false financial statement.

(Dkt. No. 24, 12/16/14 Hr'g Tr. 8:16-9:7). The Court then denied the Plaintiff's motion to amend the complaint to include the § 523(a) count (Dkt. No. 24, 12/16/14 Hr'g Tr. 9:13-14). This Court will not revisit any of these rulings by Judge Kaplan, as it was not expressly asked to do so, although some of Plaintiff's arguments seem to do so implicitly, and this Court agrees with Judge Kaplan's analysis in any event.

On April 9, 2015, a trial was held (Dkt. No. 30). The Debtor and his brother Gilberto M. Rivas were the only witnesses called (Dkt. No. 30). For the reasons that follow, the Court will deny Plaintiff's claims for relief and dismiss the Complaint, with prejudice and without costs.

## IV. STATEMENT OF FACTS

### A. The Purchase of the Vehicle

On June 20, 2013, the Debtor's 21st birthday, the Debtor and his brother, Gilberto M. Rivas ("Gilberto" together with Debtor the "Rivases" or the "Rivas Brothers"), went to ANS Auto Sales, Inc. ("ANS") in Teterboro, New Jersey with the intention of purchasing a vehicle (Dkt. No. 30, 4/9/15 Hr'g Tr. 50-53). At the time of the purchase, the Debtor was attending college, living with his mother, and making $10.50 an hour (Dkt. No. 30, 4/9/15 Hr'g Tr. 53:4-6; 73:10-11; 132:21-25; 133:1-25).

The Debtor testified that the Vehicle was being purchased mostly as a gift for him, as he could not afford to purchase the Vehicle himself. It was the first time he was purchasing a car (Dkt. No. 30, 4/9/15 Hr'g Tr. at 51:9-21). He also testified that while the car was a gift from his brother, he would

4

help him pay for it whenever he could (Dkt. No. 30, 4/9/15 Hr'g Tr. 81:3-82:22). Debtor testified, and BMW has not disputed, that Gilberto conducted all the negotiations with ANS. Debtor further testified that, as a result, "when I signed, I was agreeing to whatever they said" (Pl.'s Ex. 14, 2/10/15 Debtor Dep. Tr. 46:23-47:2).

The Rivases both testified that they dealt with two men at the dealership, a man with a Russian accent and a man named Neff (Dkt. No. 30, 4/9/15 Hr'g Tr. 51:23-24). Both Rivases spoke with "Neff" and with the man with the Russian accent, but Gilberto, who is seven years older than the Debtor and is like a "father figure" to him, played the lead role in negotiations for the purchase of the Vehicle (Dkt. No. 30, 4/9/15 Hr'g Tr. 54:14-23; 55:15; 56:2; 113:5-13 and 24; 121:1-25; 141:22-142:1).

At trial, there was fairly extensive testimony regarding two documents signed by the Debtor in connection with the purchase: a Dealertrack loan application (Pl.'s Ex. 4) and a Retail Installment Contract (Pl.'s Ex. 5). The Debtor testified that he saw and signed only the last page of the Dealertrack loan application (Pl.'s Ex. 4). Debtor acknowledged that much of the personal information on the application was correct (e.g., name, address, phone number, date of birth, etc.), but also testified that some of it was not, such as the mortgage payment, rent, level of education and business telephone. Significantly, he also testified that the salary information ($74,000) was incorrect and that he was not the comptroller of his company. In fact, he did not know what a comptroller was (Dkt. No. 30, 4/9/15 Hr'g Tr. 58:6-24; 69:14-74:21). Debtor provided the dealer with three paystubs that showed his salary. Other than the paystubs, Debtor testified that he did not tell them what his salary was (Dkt. No. 30, 4/9/15 Hr'g Tr. 58:12-14; 78:19-23). Debtor further testified that none of the numbers were on the Retail Installment Contract (Pl.'s Ex. 5) when he signed it and that he did not review it before signing because he trusted his brother (Dkt. No. 30, 4/9/15 Hr'g Tr. 57:9-18; 79:19-80:23).

Ultimately, an agreement was reached for the purchase of the Vehicle (Pl.'s Ex. 11, ¶ 4). The Debtor and Gilberto paid $4,000 and $6,000 in cash, respectively, and traded in Gilberto's 2006 Range Rover, valued at $18,000 as a trade-in (with no liens against it), resulting in a total down payment of

5

$28,000 towards the purchase price of the Vehicle (Dkt. No. 30, 4/9/15 Hr'g Tr. 53:11-13 and 23; 54:8; 122:23-25; 138:3-18; Pl.'s Ex. 11, ¶ 5). The balance of the purchase price was financed with a $48,444.85 loan (for a total purchase price of more than $76,000[3]) from an entity known as Alphera Financial, but the loan was sold shortly thereafter to Plaintiff BMW (Dkt. No. 1, Compl., ¶ 7; Dkt. No. 31, Def's. Post-Trial Br., Ex. A).

The loan required payments of $878.54 per month (Dkt. No. 30, 4/9/15 Hr'g Tr. 33:13-17). Although Debtor and his brother testified that they were surprised that the payments were over $800 per month, there is no dispute that they made three payments of $850 or more (Dkt. No. 30, 4/9/15 Hr'g Tr. 86:8-10). Gilberto contributed at least seventy percent of those payments (Hr'g Tr. 86:11-14). On the date of the purchase, Gilberto paid an additional $600 toward a six-month car insurance policy through State Farm, and another $500 the following week (Dkt. No. 30, 4/9/15 Hr'g Tr. 124:4-125:1-8; see also 61:13-22). According to the Rivas Brothers, one of the dealership representatives assured them that the Vehicle would be fully insured for six months (Dkt. No. 30, 4/9/15 Hr'g Tr. 124:4-125:8; Pl.'s Ex. 11, ¶ 7; Pl.'s Ex. 13, ¶¶ 7 and 13).

Although BMW originally claimed the Vehicle was not insured, there is now no dispute that insurance was in place for a period of time prior to the loss of the Vehicle, but subsequently canceled (Dkt. No. 25, Pl.'s Proposed Findings of Fact, ¶¶ 26-30). A Notice of Cancellation of the policy, dated July 1, 2013 and effective August 2, 2013, was produced at trial (Dkt. No. 25, Pl.'s Proposed Findings of Fact, ¶ 30; Pl.'s Ex. 8). Debtor testified that he never saw the Notice of Cancellation, even though it

---

[3] The Retail Installment Sale Contract produced at trial (Pl.'s Ex. 5) reflects a purchase price of $72,754. However, that document also reflects a cash deposit of $25,000, which contradicts the undisputed testimony of the Rivas Brothers that the down payment consisted of $10,000 in cash and $18,000 for the trade in of Gilberto's Range Rover. The $3,000 difference between that $28,000 down payment and the $25,000 "cash" down payment reconciles (for the most part) the $76,000 total stated above and the $72,754 price stated on the contract. There is no way to reconcile the $25,000 cash down payment shown on the contract with the uncontroverted testimony of the Rivas Brothers that $18,000 of their down payment was based on the trade-in of the Range Rover and $10,000 was in cash. The Court accepts the Rivas Brothers' uncontroverted testimony as to the down payment and trade-in.

6

was properly addressed to him. According to the Notice, the insurance was canceled for various driving infractions by the Debtor (Dkt. No. 25, Pl.'s Proposed Findings of Fact, ¶¶ 32-34).

As to the payments, Gilberto testified that they were supposed to be between $350 and $450, and that he could not believe it when he received a bill for $878 (Dkt. No. 30, 4/9/15 Hr'g Tr. 125:11-24). The Debtor inconsistently testified that his brother told him he would try to get the monthly payments at $250 or $150, but never $800 (Dkt. No. 30, 4/9/15 Hr'g Tr. 65:4-10; 100:15-18). Whatever those payments were supposed to be, Gilberto contacted the dealership about the $850 payments and was told the situation would be "taken care of," and that the payments would be lowered after the Range Rover was sold (Dkt. No. 30, 4/9/15 Hr'g Tr. 148:1-149:2; 150:6-16). No evidence was submitted indicating that the Range Rover was sold or that the payments were ever lowered. Subsequently, during the course of this litigation, Gilberto returned to the dealership in order to obtain information needed in this case, only to find its doors closed (Dkt. No. 30, 4/9/15 Hr'g Tr. 127:20-128:2).

### B. The Theft

On October 20, 2013, the Debtor lent the Vehicle to Gilberto so that he could visit his former girlfriend in the Bronx (Dkt. No. 30, 4/9/15 Hr'g Tr. 96:14-25; 97:1-11). Debtor routinely permitted Gilberto to use the Vehicle (Dkt. No. 25, Pl.'s Proposed Findings of Fact, ¶ 35). Along the way, Gilberto stopped at a well-known Dominican food truck and ordered food (Dkt. No. 30, 4/9/15 Hr'g Tr. 115:18 and 21-23; 116:1-2 and 4-6; 153:12-13). Gilberto left the Vehicle running while he ordered the food and when he went back to the food truck to pick it up. When he returned with the food to the place where the Vehicle had been parked, it was no longer there (Dkt. No. 30, 4/9/15 Hr'g Tr. 116:19-117:1).

Gilberto spent several minutes looking for the Vehicle and eventually came to the realization that it had been stolen. He then called the police and his brother, the Debtor (Dkt. No. 30, 4/9/15 Hr'g Tr. 117:22-118:2; 63:10-64:2). Gilberto asked his brother for the VIN number and the insurance policy number, but his brother was not able to get the insurance information (Dkt. No. 30, 4/9/15 Hr'g Tr.

7

119:6-17). After the police arrived, they informed Gilberto that the Vehicle was uninsured (Dkt. No. 30, 4/9/15 Hr'g Tr. 120:1-3). A police report was filed (Dkt. No. 30, 4/9/15 Hr'g Tr. 118:19-20).

Gilberto subsequently alerted the dealership to the Vehicle's disappearance and was instructed by a representative of the dealership to continue to make payments and not to worry (Dkt. No. 30, 4/9/15 Hr'g Tr. 99:23-25; 100:1-3). During the trial, both the Debtor and his brother testified that they took no part in the disappearance or theft of the Vehicle (Dkt. No. 30, 4/9/15 Hr'g Tr. 64:5-10 and 119:2-5).

### C. The Recovery of the Vehicle

On or about July 9, 2015, after the trial of this case, the Vehicle was recovered in California by the Alameda County Regional Auto Theft Task Force (Dkt. No. 34, 7/9/15 Letter to the Court from Debtor's Counsel). BMW ultimately recovered the Vehicle on August 20, 2015 (Dkt. No. 39, Pl.'s Resp. to Debtor's 2nd Mot. to Suppl. R., ¶ 10). No evidence was submitted indicating that the Alameda County Task Force or any other investigative body charged either of the Rivas Brothers with participating in the theft or that they were the subject of any related investigation. BMW urges this Court to find that they were involved in the theft on the basis of circumstantial evidence and speculation. This, the Court will not do.

### D. BMW's Arguments and Evidence in Support of its Claims

Principally, BMW relies upon the Debtor's lack of income ($7,400 in 2012 and $8,300 in 2013) to make the payments on the Vehicle, which involved a loan in the amount of $48,444.85 and required monthly payments of $878.54, the failure to maintain insurance on the Vehicle,[4] the discrepancy in the alleged location of the theft and what the monthly installment payments were to be, and, more generally, the argument that the "bare and uncorroborated explanations of the Debtor and his brother regarding the circumstances of the disappearance were unconvincing" and generally, not credible (Dkt. No. 36, Pl's Resp. to Debtor's 1st Mot. to Suppl. R., ¶¶ 1-12). The discrepancies and credibility issues highlighted

---

[4] BMW does not allege or dispute that the Vehicle was insured for at least some period of time, beginning when it was purchased.

8

by Plaintiff do raise questions about at least some of the details, but not enough to satisfy BMW's ultimate burden of proof or discredit the essential elements of Debtor's principal position throughout this litigation; i.e., the Vehicle was stolen by others while being used by his brother with Debtor's permission.

### (1) The "Disappearance" of the Vehicle

BMW argues that Gilberto's testimony about the disappearance of the Vehicle "strains the bounds of credibility." Here, BMW takes issue, in particular, with Gilberto's testimony that in the two to three minutes during which he left the BMW (still running) to pick up his food, it disappeared. BMW argues (without factual or other support) that the chances are "astronomical" that a car thief would happen to be walking by the food truck, notice the BMW was running and steal it (Dkt. No. 33, Pl.'s Post-Trial Br. at 10-11). That argument ignores the fact, as stated by BMW, that Gilberto first exited the Vehicle to order his food and then returned to the Vehicle, leaving again ten minutes later to pick up the food. (Dkt. No. 33, Pl.'s Post-Trial Br. at 10). Thus, a thief had more than sufficient time to observe the BMW, note that it was running (without a driver or passenger) and steal it when Gilberto left it running a second time. That can certainly happen in not only twelve to thirteen minutes, but also in the two to three minutes Gilberto left the Vehicle to pick up his food.

### (2) The Location and Time of the Theft

BMW here notes the discrepancy between the testimony of Debtor and his brother and the application for the police report as to the location of the Vehicle and when the theft occurred. As to the location, as noted above, Gilberto testified that the Vehicle was stolen near 207th Street in Manhattan, and Debtor confirmed that was what Gilberto told him, as did his answers to Interrogatories. Then, BMW notes that the application for a copy of the Police Report subsequently made on behalf of the Debtor indicates that the theft occurred at 204 9th Avenue in Manhattan, which is in the downtown Chelsea section. However, the application for the Police Report was made on October 14, 2014, about a year after the theft, and referenced the 34th Precinct, which is in Washington Heights, not the precinct in Chelsea. Further, the application was filled out by someone other than the Debtor, and English skills

9

of both Debtor and Gilberto are less than perfect, as English is their second language. Finally, and perhaps most significantly, the Vehicle was ultimately recovered in California by the police (Dkt. 39, Pl.'s Resp. to Debtor's 2nd Mot. to Suppl. R., ¶¶ 3, 7, 8, 10 and 13). The recovery of the Vehicle by the police in California in these circumstances is ultimately far more supportive of the Debtor and Gilberto's version of the events, both in terms of the occurrence of the theft and where and how it happened, than BMW's unsupported speculation that the Rivas Brothers orchestrated the theft.

In contrast, the relatively small discrepancies as to the time of the theft -- between 10 p.m. and 11 p.m. (in answers to interrogatories) or 1:10 a.m. and 1:20 a.m. (in the Police Report Application) and the exact street address where it occurred are of minimal significance in this Court's view. The Rivas Brothers were consistent as to many of the circumstances surrounding the theft, i.e., that Debtor let Gilberto use the Vehicle to visit his girlfriend in the Bronx, that he stopped at a food truck in upper Manhattan where the Vehicle was stolen, that it was stolen at night, and that the theft was reported to the police. The discrepancy in the application for a copy of the police report, made a year after the theft, as to the location of the theft is determined to be an inadvertent error by whomever filled out the application (which was apparently Debtor's counsel).

### (3) The Lack of Insurance and Income

Although there is no dispute that the Vehicle was uninsured at the time of its theft in October 2013, there is similarly no dispute that the Vehicle was insured through August 1, 2013 (Dkt. No. 25, Pl.'s Proposed Findings of Fact, ¶¶ 26-30; Pl. Ex. 8, Notice of Cancellation). Similarly, there is no dispute that the Rivas Brothers paid $1,100 towards insurance when they purchased the Vehicle and that they were told that would insure the Vehicle for six months -- through December of 2013. That amount is not an insignificant sum, and certainly would appear to this Court to be sufficient to pay for six months of insurance. The most troubling (and least convincing) aspect of the Debtor's testimony in this regard is his claim that he did not receive Notice of Cancellation of the insurance policy, which was properly addressed to his home. However, as was noted by Judge Kaplan, the failure to maintain insurance on a

10

single piece of property does not rise to the level of a § 727(a)(3) violation. Thus, even if Debtor received the Notice of Cancellation, the failure to maintain insurance was negligent and/or a breach of contract, but does not give rise to a § 727(a)(3) claim.

Further supporting the Debtor's version of the events is the fact that he and his brother made a down payment of $28,000 on the Vehicle -- $10,000 in cash and $18,000 -- just a few months before the theft. It simply does not make sense to the Court that they would make that significant down payment, three $850(+/-) monthly payments, and pay $1,100 for insurance, and then orchestrate the theft of the Vehicle, particularly when it was uninsured. BMW's position is also undermined by the undisputed fact that the Vehicle was found in California after being stolen, and the lack of any direct evidence that in any way tied the theft to the Debtor. Similarly inconsistent with BMW's position is undisputed testimony of Gilberto and the Debtor that the Vehicle was reported as stolen to the police and that they then tried to obtain the insurance information for the police, but could not find it on State Farm's website because the policy had been canceled.

Rather than orchestrating a theft of the Vehicle, this Court finds it much more likely that the Debtor and his brother were taken advantage of by ANS by overpaying for the Vehicle and the loan and not having the loan and sale and trade-in properly documented. BMW may also have been somewhat "duped" by ANS when it quickly purchased the loan with false information that this Court finds was at least in part provided by ANS. In particular, this Court finds that there is little or no likelihood that ANS believed or had any proof that Debtor made $74,000 and/or was the comptroller of his company. Instead, the Court finds it much more likely that the Debtor's income was inflated by ANS so that he would qualify for the loan.

The Debtor and/or his brother may also have been negligent, or less than diligent in: (i) failing to maintain insurance on the Vehicle; (ii) leaving it running while going to pick up food; and (iii) at least arguably, failing to report the theft to Alphera (the original finance company) or BMW, but that negligence does not rise to the level of intentional misconduct required by § 727(a)(2). Nor has BMW

11

proven that the Debtor concealed, destroyed, mutilated, falsified in failing to keep or preserve any recorded information, books or records, necessary to determine the Debtor's financial condition or business transactions under § 727(a)(3). Indeed, BMW has not specifically (or generally) identified any such missing information (as opposed to the lack of an in-force insurance policy). Similarly, as to BMW's § 727(a)(5) claim, the Court is satisfied with the Debtor's explanation of the loss of the BMW based on his testimony, the corroborating testimony of his brother, the filing of the police report, the recovery of the Vehicle in California and the lack of any contradictory testimony from any other witness.

In sum, this Court finds that the weight of the evidence supports Debtor's position that the Vehicle was stolen by someone other than Debtor or his brother in the Washington Heights section of Manhattan on the evening of October 20, 2013 or in the early morning hours of October 21, 2013 and that the Debtor was not involved in the theft (and nor was his brother).

## V.  STATEMENT OF LAW

Plaintiff's Complaint seeks to deny the Debtor his discharge under 11 U.S.C. §§ 727(a)(2), (3) and (5). However, the focus of Plaintiff's case at trial and in its post-trial brief was § 727(a)(5), i.e., that Debtor failed to explain satisfactorily the loss of the Vehicle (Dkt. No. 33, Pl.'s Post-Trial Br. at 1). This opinion addresses each of those Code sections, focusing first on the § 727(a)(5) claim and then addressing the §§727(a)(2) and (3) claims.

### A. The § 727(a)(5) Claim. The Alleged Failure to Satisfactorily Explain the Loss of the Vehicle

Section 727(a)(5) provides that the Debtor will be denied a discharge if -

> (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under the paragraph, any loss of assets or deficiency of assets sufficient to meet the debtor's liabilities.

Under this provision, the creditor has the initial burden of proof by a preponderance of the evidence standard. *In re New Jersey Mobile Dental Practice, P.A.*, 2012 WL 3018052, at *11 (Bankr. N.J. July 24, 2012), *aff'd*, 2012 WL 5472121 (D.N.J. Nov. 9, 2012); *In re Spitko*, 357 B.R. 272, 318

12

(Bankr. E.D. Pa. 2006). That is, the moving party has the initial burden of identifying the asset in question and showing that the debtor no longer has it. *In re Ross*, 359 B.R. 690, 700 (Bankr. N.D. Ill. 2007); *In re Spitko*, 357 B.R. at 318; *see also In re Ishkhanian*, 210 B.R. 944, 953 (Bankr. E.D. Pa. 1997) (moving party must provide evidence of the disappearance of the assets or unusual transaction disbursing of assets). There is no requirement under 11 U.S.C. § 727(a)(5) that the Debtor act with fraudulent intent. *In re Ishkhanian*, 210 B.R. at 953.

Once the moving party has satisfied the initial burden of proof, the burden shifts to the debtor to explain satisfactorily the loss of assets. *In re Ross*, 359 B.R. at 700; *In re Spitko*, 357 B.R. at 318-19. Whether a debtor's explanation is satisfactory is a "question of fact" to be determined by the factfinder. *In re Spitko*, 357 B.R. 272, 319. Although the explanation need not be far-reaching and comprehensive, it must consist of more than a "vague, indefinite, and uncorroborated hodgepodge of financial transactions." *In re Spitko*, 357 B.R. at 319 (internal citations omitted).

Here, there is no question that Plaintiff has met its initial burden of showing that the Debtor no longer has the Vehicle; indeed, that fact is admitted. The question for this Court to decide is whether Debtor has "explain[ed] satisfactorily" the loss of the Vehicle:

> 'A satisfactory explanation has not been definitively defined, but the debtor probably must explain the losses or deficiencies in such manner as to convince the court of good faith and businesslike conduct.' Collier on Bankruptcy 15 ed. 6–727 Collier on Bankruptcy–15th Edition Rev. P 727.08.
>
> According to one opinion:
>
> The word 'satisfactorily' . . . may mean reasonable, or it may mean that the court, after having heard the excuse, the explanation, has the mental attitude which finds contentment in saying he believes the explanation-he believes what the bankrupts say with reference to the disappearance or the shortage. He is satisfied. He no longer wonders. He is contented.
>
> *In re Bodenstein*, 168 B.R. 23, 33 (Bankr. E.D.N.Y. 1994) (citing *In re Shapiro & Ornish*, 37 F.2d 403, 406 (N.D. Tex. 1929), *aff'd sub nom. Shapiro & Ornish v. J.J. Holliday*, 37 F.2d 407 (5th Cir. 1930)).

13

*In re Ross*, 359 B.R. at 700.

In this regard, the Court also notes that it need only decide whether the explanation satisfactorily describes what happened to the asset, "not whether what happened to it was proper." *In re Ross*, 359 B.R. at 700, *citing In re Nye*, 64 B.R. 759, 762 (Bankr. E.D.N.C. 1986). In the *Ross* case, which also involved a § 727(a)(5) claim and the alleged theft of a financed vehicle, the Court found that the evidence showed that the Vehicle was stolen and that "it did not matter whether or not it was wise to park it in a place where other auto thefts occurred. *In re Ross*, 359 B.R. at 701. There, the Court was satisfied by the evidence explaining what happened to the vehicle (it was towed by a third party that the Debtor thought was Plaintiff's agent), as corroborated by the police report filed by the Debtor, which was the only written evidence documenting the loss. *Id.* at 701. In any event, a debtor's explanation of the loss of assets can be satisfactory without corroborating records, as was noted by the *Ross* court. *Id.*[5]

This Court finds the *Ross* case instructive. In this case, the only direct evidence as to what happened to the Vehicle was the testimony of the Rivas Brothers, the police report that was filed and the Vehicle's ultimate recovery in California by an Auto Theft Task Force. The Rivas Brothers confirmed that the Debtor had loaned the Vehicle to Gilberto, as he often did, and that Gilberto negligently left the Vehicle running when he went to pick up his food. After looking for the Vehicle, Gilberto called the police and his brother to report the theft and get information needed by the police, including as to any insurance. The police report was filed in the Washington Heights (34th) precinct of Manhattan and the Vehicle was ultimately recovered in California (with an altered VIN number). Both brothers testified that they had nothing to do with the Vehicle's disappearance.

---

[5] *See also In re Ishkhanian*, 210 B.R. at 954 (Debtor's explanation that she invested a previously unaccounted-for $24,000 in her failing business constituted satisfactory explanation of loss of assets under 11 U.S.C. § 727(a)(5)).

14

In response, BMW offers only speculation, some circumstantial evidence and incredulity.[6] That is not enough to sustain an objection to discharge. As is noted by the Debtor, the Plaintiff has the ultimate burden of proving its objection to discharge and objections are to be liberally construed in favor of the Debtor and strictly against the party objecting to discharge. *See, e.g., Rosen v. Bezner*, 996 F.2d 1527, 1531 (3rd Cir. 1993). Here, for the reasons previously stated, the Court finds the Debtor met his burden to satisfactorily explain what happened to the Vehicle and that BMW failed to provide sufficient evidence to refute that explanation, whether by a preponderance of the evidence standard or otherwise.

### B. The § 727(a)(2) and (3) Claims

Sections 727(a)(2) and (3) provide that the Debtor may be denied a discharge if:

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
>
> (A) property of the debtor, within one year before the date of the filing of the petition; or
> (B) property of the estate, after the date of the filing of the petition;
>
> (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case; . . .

11 U.S.C. § 727(a)(2) and (3).

---

[6] The Court notes that in Plaintiff's Complaint, it was alleged that the Vehicle was never insured and that the Debtor made no payments under the financing agreement. Both those allegations were proven to be inaccurate, as the uncontroverted evidence showed that (i) that the Debtor and his brother paid $1,100 for what they thought was six months of insurance (Dkt. No. 25, Pl.'s Proposed Findings of Fact, ¶¶ 26-30); (ii) insurance was in place through at least August 1, 2013 (*id*. at ¶ 30; Pl.'s Ex. 8); and (iii) the Debtor made at least three payments of $850 or more towards the Vehicle (Dkt. No. 33, Pl.'s Post-Trial Br. at 4-5).

>    **(i)    Section 727(a)(2). Transfer or Concealment of Property Within One Year of Filing with Intent to Hinder, Delay and Defraud**

As to this claim, the Plaintiff did not include it in its pre- or post-trial submissions; thus, it may be deemed abandoned by the Court. *See, e.g., Heiar v. Crawford County, Wisc.*, 746 F.2d 1190, 1196-97 (7th Cir. 1984), *cert. den.*, 472 U.S. 1027 (1985) (and cases cited therein) (a ground not raised in the trial court or raised but not pressed is deemed abandoned and cannot be a basis for reversal on appeal unless the issue goes to subject-matter jurisdiction); *Tinio v. St. Joseph Regional Medical Ctr.*, 2015 WL 1530912, *7 n.3 (D.N.J. April 6, 2015), *aff'd*, 645 Fed. Appx. 173 (3d Cir. 2016) (a claim raised in the complaint but not pressed on motion for summary judgment is deemed abandoned).  However, even if the Court were to consider this claim -- which must be under § 727(a)(2)(A) as the theft occurred on October 20, 2013, within one year of the Debtor's filing -- it would be denied.

For the reasons previously stated, and based on the presumptions in favor of discharge, *see, e.g.*, *Bellco First Fed. Credit Union v. Kaspar*, 125 F.3d 1358, 1361 (10th Cir. 1997), the Court finds that the Plaintiff failed to meet its burden of showing that this Debtor, with intent to hinder, delay and defraud creditors, caused the Vehicle to be concealed, removed or otherwise transferred within one year of his filing.  Instead, this Court finds that Gilberto was negligent in his handling of the Vehicle while it was on loan from his brother, the Debtor.  The Court further finds that while the Plaintiff may have shown that the Debtor was negligent in failing to maintain insurance on the Vehicle, Plaintiff has failed to prove that the Debtor was in any way involved in the theft of the Vehicle or that he had the intent to hinder, delay or defraud creditors.

>    **(ii)    Section § 727(a)(3). Failure to Keep or Preserve Records for Which Debtor's Financial Condition May Be Ascertained**

For similar reasons, the Court finds that BMW failed to meet its burden of proof on this claim. First, BMW has failed to demonstrate what records the Debtor failed to keep.  The reason for that is simple:  BMW's claim here is really that the Debtor failed to maintain insurance (Dkt. No. 25, Plaintiff's

16

Pretrial Br. at 1, 2 and 3). As was previously held by Judge Kaplan, Plaintiff's efforts to convert a negligence or breach of contract claim based on the failure to maintain insurance into a sustainable objection to discharge must fail as a matter of law. First, this claim was already denied by Judge Kaplan, as noted above. Next, the plain language of the statute does not support such an individualized claim, and nor does the related case law. *See, e.g., In re Bafford*, 61 B.R. 631, 632 (Bankr. W.D. Tenn. 1985), where the court held that the failure to maintain insurance on collateral, while amounting to a "breach of contract and negligence" on the part of the debtor, has not been held to constitute "willful and malicious injury." *See also In re Barriger*, 61 B.R. 506, 508 (Bankr. W.D. Tenn. 1986), where the debtor was granted a discharge notwithstanding a contest under 11 U.S.C. §§ 727(a)(2) and 523(a)(6) even though the uninsured vehicle was damaged and the debtor let the insurance lapse because she could not afford the premiums. Likewise, in *In re Darnell*, 2010 Bankr. LEXIS 455, at *2 (N.D. Ala. Feb. 12, 2010), the debtor was granted a discharge when the uninsured collateral was stolen after it had been chained to a tree.

In support of its § 727(a)(3) claim (which it also seems to have largely abandoned), BMW relies principally upon the case of *In re Bernat,* 57 B.R. 1009, 1013 (E.D. Pa. 1986), *on remand* 61 B.R. 586, 587 (Bankr. E.D. Pa. 1986). There, a creditor objected to the discharge of the debtor, who was in the business of auto body repair and towing on the grounds that he failed to adequately explain the loss or theft of two trucks (under § 727(a)(5)) and failed to preserve or keep insurance records relating to the trucks (under 727(a)(3)). Focusing on the § 727(a)(3) claim, the Court noted that the debtor provided no evidence of any insurance, even after being afforded an opportunity to do so on remand. *In re Bernat*, 61 B.R. at 587. The Debtor also failed to explain why he had no insurance when it was required by state law. And although the case was ultimately decided on § 727(a)(3) grounds, the District Court (in reversing the Bankruptcy Court's original decision), noted that the debtor provided no explanation at all regarding the loss or theft of the vehicle.

*Bernat* is easily distinguishable from this case where the Debtor (and his brother) paid for and

17

actually had insurance (for at least a period of time) and the circumstances surrounding the theft were explained in detail and corroborated in a police report. Further, the debtor in *Bernat* was in the auto repair and towing business. In contrast, this inexperienced twenty-one-year old Debtor was purchasing his first car for personal use. Thus, *Bernat* is no way controlling in this case, as a matter of fact or as a matter of law.

Finally, to the extent *Bernat* even arguably stands for the position that the failure to maintain insurance (as opposed to records of insurance, which is what this Court believes is *Bernat's* actual holding), this Court respectfully declines to read § 727(a)(3) so broadly. By its plain language, that section of § 727 applies to the failure to keep or preserve books and records from which the Debtor's overall financial condition or business transactions can be ascertained. BMW's claims, as asserted in its Complaint, at trial and its pre- and post-trial submissions, do not relate to any such general failure. Instead, they are based on the Debtor's failure to maintain insurance on one particular item: the Vehicle. Judge Kaplan previously found that the failure to maintain insurance on a specific piece of property cannot sustain a § 727(a)(3) claim. Based on the plain language of § 727(a)(3), the case law cited above and the facts of this case, this Court agrees.

### VI. CONCLUSION

For all these reasons, BMW's objection to the Debtor's discharge is denied. An order will be entered in conformance with this Opinion.

Dated: October 21, 2016                                 /s/ Vincent F. Papalia
                                                        VINCENT F. PAPALIA
                                                        United States Bankruptcy Judge